# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| METROPOLITAN LIFE INSURANCE CO., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:11-CV-1789 CAS |
| ) | |
| MARY BAKER, et al., ) | |
| ) | |
| Defendants. ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter is before the Court following a one-day bench trial held on April 8, 2013. This is a dispute over the proceeds of a Metropolitan Life Insurance Company policy issued to decedent Troy L. Baker, Sr. The main issue for determination is whether Mr. Baker was mentally competent to execute a change of beneficiary designation in March 1991 that changed the sole beneficiary of the Policy from his daughter, defendant and cross-plaintiff Deborah A. Baker, to his former spouse, defendant and cross-defendant Mary Baker, and whether Mary Baker unduly influenced Mr. Baker's actions. Having considered the pleadings, trial testimony and exhibits, the Court hereby makes and enters the following findings of fact ands conclusions of law, in accordance with Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. Metropolitan Life Insurance Company ("MetLife") filed a Complaint in Interpleader ("Complaint") in this Court on October 13, 2011, naming as defendants Mary Baker, Deborah A. Baker, and Troy L. Baker, Jr. (Complaint in Interpleader, Doc. 1).

2. At issue are the proceeds of a MetLife life insurance policy issued to Troy L. Baker, Sr. (sometimes referred to as "Mr. Baker") in the principal amount of $13,988.00. (Doc. 1-1, Ex. A, Part 1 to MetLife's Complaint in Interpleader).

3. The MetLife policy (the "Policy") was issued to Mr. Baker in connection with his employment with General Motors Corporation, and pursuant to an employee welfare benefit plan established under the Employee Retirement Income Security Act of 1974, as amended ("ERISA") 29 U.S.C. §§ 1001, et seq.

4. The MetLife Summary Plan Description ("SPD") establishes the right of a Plan participant such as Mr. Baker to name his or her beneficiary, and states that benefits will be paid to the beneficiary. (Doc. 1-2 at 42, Ex. A Part 2 to Complaint in Interpleader).

5. The most recent Beneficiary Designation form on file with MetLife is dated March 7, 1991 and designates defendant Mary Baker as the sole primary beneficiary of the life insurance benefits at issue. (Trial Ex. B).

6. The prior beneficiary designation form on file with MetLife is dated July 22, 1990 and designates defendant Deborah Baker as the sole primary beneficiary of the life insurance benefits at issue. (Trial Ex. C).

7. The next prior beneficiary designation form on file with MetLife was signed on June 28, 1988 and designates defendants Deborah Baker and Mary Baker as coequal primary beneficiaries of the life insurance benefits at issue. (Trial Ex. D).

8. Mr. Baker died on December 26, 2009 when the Policy was in full force and effect. Shortly thereafter, Mary Baker submitted a statement of claim to MetLife for the insurance proceeds pursuant to the most recent beneficiary designation which Mr. Baker executed on March 7, 1991. (Complaint at ¶¶ 14-16).

9. Mr. Baker's adult children, Deborah Baker and Troy Baker, Jr., sent a letter to MetLife accusing Mary Baker of fraud and requesting that MetLife withhold payment of the Policy proceeds to Mary on that basis. (Doc. 1-8, Ex. G to Complaint).

10. After receiving the letter, MetLife filed its Complaint in Interpleader and deposited the Policy proceeds and accrued interest into the Court registry, and has been dismissed from the case. (See Order of Feb. 15, 2012 (Doc. 17) and Preliminary Order in Interpleader and for Dismissal and Discharge of Apr. 24, 2012) (Doc. 26)).

11. Deborah Baker and Troy Baker, Jr. filed a Cross Claim against Mary Baker alleging that Mr. Baker was suffering from Alzheimer's disease when he made Mary Baker his beneficiary on March 7, 1991, that Mary unduly influenced him and, accordingly, the beneficiary designation to Mary is void. (Cross Claim, Doc. 9, ¶ 15).

12. Mr. Baker and Mary Baker were married from June 1983 until April 1990 when they divorced. (Tr. Transcript at 3, ll. 1-12).

13. Mary Baker testified that the divorce was caused because Mr. Baker wanted to move to Moberly, Missouri, where some of his family lived, and she was unable to do that. (Trial Tr. at 33, ll. 10-17). Mary testified that she had begun seeing differences in Mr. Baker after five or six years of marriage, including that he was forgetful and she thought he might have a nervous breakdown after serving as executor of his father's estate. (Id. at 32, ll. 17-25 to 33, ll. 1-6). Mary testified that she "told him I would give him a divorce, but I wanted him to first go the doctor and find out what was going on with him." (Id., ll. 18-23).

14. In January 1990, Mr. Baker underwent a psychiatric evaluation at Barnes Jewish Hospital. The evaluation report states that his chief complaint was "trouble remembering things." (Tr. Ex. 1 at 3). The report states that Mary Baker reported that beginning four years prior, Mr.

3

Baker began having "slowly progressive difficulties with memory and thinking." (Id.) The report provides these details concerning the history of Mr. Baker's condition:

> These problems have continued to the point now that Mr. Baker gets mixed up writing checks, while working with machinery in the house (he doesn't remember where the switch is to turn it off), he doesn't remember where the phones are, he needs to figure out how to turn off the hose, he forgets where he left his car, he may forget where he was driving if it is out of the neighborhood. His remote memory is also not as good as it used to be, although we do not have good confirmation since his wife has only been married to him for 6 years. The patient saw Dr. Richard Sohn approximately one and one-half to two years ago who reported that a CT Scan and EEG was normal.
>
> In addition to the memory problems, his wife reports that his judgement [sic] is not as good as it used to be in terms of problem solving. She reports that he is not aware of the date and not as good with remembering dates of events. He also gets confused over the ages of his children. Mr. Baker still is able to take care of his own bodily functions and does dress himself though it takes him a long time. He is still interested in his hobbies of tinkering, reading the newspaper and watching TV, although he is not as good at fixing things as he had been in the past.

(Tr. Ex. 1 at 3; Tr. at 25, ll. 5-25 to 26, ll. 1-18).

15. Mr. Baker's psychiatric evaluation report of January 1990 stated the following under the heading of "Mental Status Examination":

> The patient is a mildly upset, nervous appearing man who appears slightly older than his stated age of 56. His flow of speech reveals a normal rate, normal rhythm, no loose associations of flight of ideas. He does have word-finding difficulties. His affect is mildly upset, but not depressed. No suicidal or homicidal ideation. He did get upset when his wife and I talked outside the room while he was clock drawing (because he didn't want us talking behind his back). Thought content without delusions, hallucinations or any Schneiderian symptoms. Oriented x 2. Memory and orientation: Short Blessed Test, 17 errors out of possible 28 (missed month, backward numbers, month backwards and only remembered John brown of the John Brown phrase).

(Tr. Ex. 1 at 4).

16. Mr. Baker's psychiatric evaluation report of January 1990 concluded with the "Impression" of "History consistent with DAT" [Dementia of the Alzheimer's Type]. (Tr. Ex. 1 at 4).

17. Mary Baker testified that the evaluating doctor did not say Mr. Baker needed to be treated for Alzheimer's related issues (Tr. at 25, ll. 2-4), and in January 1990, Mr. Baker did not show any signs of confusion about who his family members were, the names of his children and grandchildren, how many children or grandchildren he had, or the nature and extent of the property he owned. (Trial Tr. at 26, ll. 19-25 to 27 at ll. 1-14).

18. Mary Baker testified that following the divorce, Mr. Baker continued to live with her in her home in Festus, Missouri until June 1990, including a ten-day period while Mary was out of town, during which he took care of the house, including mowing the grass, and helped a neighbor build rabbit hutches. (Tr. at 34, ll. 4-10). Mary testified that she and Mr. Baker "liked each other, you know, we had no animosity toward each other," even after the divorce. (Tr. at 34, ll. 22-25).

19. In June 1990, Mr. Baker told his daughter, Deborah Baker, that he wanted to come live with her in her home in North Carolina. Deborah Baker traveled to Missouri and moved Mr. Baker to North Carolina. (Tr. at 60, ll 1-25 to 61, ll. 1-14). Mr. Baker lived with Deborah for almost three months and then moved into a rental town home next door where he lived alone. (Tr. at 61, ll. 15-22). Deborah Baker's teenage sons would often, but not always, spend the night with him. (Tr. at 65, ll. 5-14).

20. Mr. Baker had a bank account while he lived in North Carolina, and Deborah Baker was on the account with him. (Tr. at 63, ll. 13-23). Mr. Baker went to adult day care four days a week while he was in North Carolina. (Tr. at 64, ll. 1-8). On weekends, Mr. Baker often went fishing with a neighbor, sometimes on the beach and sometimes in a boat. (Tr. at 67, ll. 4-19).

5

21. On July 22, 1990, Mr. Baker executed a MetLife Designation of Beneficiary form that made Deborah Baker the sole beneficiary of the Policy. (Tr. Ex. C). Previously, Mary Baker and Deborah Baker were coequal primary beneficiaries of the Policy under a June 28, 1988 Designation of Beneficiary form. (Complaint, Ex. D). Deborah Baker testified it was Mr. Baker's decision to name her as beneficiary, that she did not tell him to name her as his beneficiary, and she believed that he had the mental capacity to make a decision like that "because of all his specifics he wanted done with it." (Tr. at 87, ll. 7-17).

22. Deborah Baker testified that in March of 1991, Mr. Baker's long-term memory was good as to things in the past, but his short term memory was bad. (Tr. at 67, ll. 20-25 to 68, ll. 1-16).

23. Deborah Baker testified that from January 1991 through March 5, 1991, she talked with Mr. Baker about his finances, and believed that he "pretty much" understood what she was talking about. (Tr. at 75, ll. 15-21). During this time period, Deborah believes that Mr. Baker signed "a couple of checks," although he was "shaky" and "trembling." (Tr. at 79, ll. 24-25 to 80, ll. 1-17). When asked if Mr. Baker had the mental ability to know what he was doing in terms of writing a check, Deborah responded, "Maybe at that moment," if she told him what to do. (Tr. at 80, ll. 21-25). Deborah did not believe Mr. Baker would know how to write a rent check unless she told him to, and this was true with all of his financial matters. (Tr. at 81, ll. 1-5).

24. Deborah Baker never applied for a guardianship or conservatorship for Mr. Baker in North Carolina. (Tr. at 81, ll. 6-9). Mr. Baker's doctors "pulled his driver's license" in North Carolina. (Tr. at 64, ll. 21-22).

25. While he lived in North Carolina, Mr. Baker called Mary Baker every two or three weeks to talk. (Tr. at 8, ll. 2-8). They would talk about what he'd done and going to the beach, and she would tell him what was going on in the family. (Tr. at 35, ll. 18-25 to 36, l. 1). Mary testified that

Mr. Baker didn't seem happy living in North Carolina, that he was depressed, and said the "kids was getting on his nerves." (Tr. at 36, ll. 2-5).

26. Mr. Baker had a step-daughter, Cheryl Schwartz, from a prior marriage. Mr. Baker had married Cheryl's mother, Virginia Baker, when Cheryl was five years old. (Tr. at 89, ll. 1-11). Cheryl had a close relationship with Mr. Baker, who she considered "more a father to me than my own." Cheryl continued to have a close relationship with Mr. Baker after her mother died, saw him regularly after her mother's death, and continued to stay in touch with both Mr. Baker and Mary Baker after they married. (Tr. at 89, ll. 16-25, to 90, ll. 1-9).

27. Cheryl Schwartz testified that around the time Mr. Baker and Mary Baker divorced, Mr. Baker was able to make change, buy things at stores and drive a car. Mr. Baker never said anything that made Cheryl think he did not understand who his family members were, or that he was confused about the names or relationships of his family members, or what property he owned. Cheryl never observed any signs of hallucinations. (Tr. at 91, ll. 2-18).

28. Not long after Mr. Baker moved to North Carolina, he called Cheryl Schwartz and told her that he was unhappy there. Cheryl testified that Mr. Baker "mentioned the children a lot, about how they bothered his things, and the food he ate." (Tr. at 92, ll. 2-13).

29. In late November 1990, Cheryl Schwartz went to visit Mr. Baker in his town home in North Carolina. Cheryl stayed with Mr. Baker for a week. (Tr. at 95, ll. 1-5). Cheryl testified that Mr. Baker's mental state then was about the same as at the time of the divorce. (Id., ll. 18-22).

30. While she was visiting him in November 1990, Mr. Baker told Cheryl that he wanted to leave North Carolina and "come home." (Tr. at 96, ll. 1-5). Mary Baker testified that Mr. Baker also called his sister, Ruth Johnson, and told her he was unhappy and depressed. (Tr. at 36, ll. 23-25).

7

31. Mr. Baker later called Mary Baker and told her he didn't like being in North Carolina, that "they wasn't treating him good," (Tr. at 8, ll. 14-15), he didn't have much food and they "was spending all of his money and he didn't have any money." (Tr. at 10, ll. 2-6). Mary never suggested to Mr. Baker that he move back to Missouri. (Tr. at 36, ll. 6-8). In late December 1990, Mr. Baker asked Mary Baker to come down to North Carolina and "get him out of there because he was very unhappy." (Tr. at 9, ll. 7-8, 22-25). Mary Baker agreed to do that. (Tr. at 96, ll. 18-21).

32. On March 3, 1991, Mary Baker, Cheryl Schwartz and a woman named Mary Blume arrived in North Carolina to bring Mr. Baker back to Missouri. (Tr. at 8, ll. 12-25; at 10; ll. 13-19; at 96, ll. 22-24). Cheryl testified that Mr. Baker was very glad to see them and couldn't wait to leave. (Tr. at 97, ll. 9-13). Cheryl Schwartz and Mary Baker testified that Mr. Baker was concerned that Deborah Baker might try to stop him from leaving. (Id. at 97, ll. 14-17; at 38, ll. 2-21).

33. On March 5, 1991, while they were still in North Carolina, Mary Baker and Mr. Baker went to an attorney obtained through a United Auto Workers ("UAW") Legal Services referral, Mr. Baker consulted with the attorney, and then executed a durable power of attorney naming Mary Baker as his attorney in fact. (Joint Statement of Facts, ¶ 5; Tr. at 11, ll. 17-25, to 12, ll. 1-12; Tr. at 38, ll. 22-25, to 39, ll. 1-11; Tr. Ex. 4). They also stopped at Mr. Baker's bank, where he closed his account. (Tr. at 12, ll. 17-25).

34. Cheryl Schwartz testified that when they traveled to North Carolina and back to Missouri with Mr. Baker, his mental state was the same as it had been in November 1990. (Tr. at 96, ll 22-25 to 97, ll. 1-8). Cheryl testified Mr. Baker was not confused about who his family members were, or the names or ages of his children or grandchildren, and did not express any confusion about what sort of assets he owned, or what accounts or vehicles he had. (Tr. at 98, ll. 21-25 to 99, ll. 1-7).

35. On March 7, 1991, after they returned to St. Louis, Mr. Baker asked Mary Baker to take him to make a change of beneficiary designation on the MetLife Policy. (Tr. at 40, ll. 1-18). Mary Baker testified that on that date, Mr. Baker was able to take care of himself and dress himself, (id., ll. 19-23), and did not appear confused about who his family members were, what sort of property he owned, or seem hesitant or confused about making the beneficiary designation. (Tr. at 41, ll. 4-15).

36. Mary Baker testified that Mr. Baker also changed the beneficiaries of his Certificates of Deposit and Individual Retirement Accounts, and that he said he "wanted to change everything." (Tr. at 13, ll. 7-12). There is no indication in the record that Mary Baker was made the beneficiary of any of Mr. Baker's other assets.

37. Mary Baker testified that Mr. Baker's mental state on March 7, 1991, was about the same as it was in January 1990, and "[m]ight actually have been a little better because he understood what was happening to him. He wasn't as confused about what was going on." (Tr. at 41, ll. 16-22).

38. When Mary Baker went to get Mr. Baker from North Carolina, she did not know whether he would come back and live with her. She thought he wanted to go to Moberly, Missouri where his brothers and sisters were. (Tr. at 39, ll. 15-25). After they arrived in Missouri, Mr. Baker told Mary he knew that as time went on, he would get worse, and asked if she would take care of him. Mary agreed to do so, and that is how he ended up living with her. (Tr. at 42, ll. 10-14).

39. Mary Baker testified that Mr. Baker was still very concerned that Deborah Baker might take some action to try and make him return to North Carolina. (Tr. at 42, ll. 15-20). Mr. Baker and Mary talked with a UAW attorney who suggested that Mary establish a guardianship over Mr. Baker. (Id. at 42, ll. 11-22). Mary Baker testified that it was Mr. Baker's wish that she become his guardian. (Id. at 14, ll. 2-12; at 18, ll. 21-25; at 43, ll. 23-25 to 44, ll. 1-5). Mary Baker filed a

9

Petition for Appointment of Guardian and Conservator in the Circuit Court of Jefferson County, Missouri on March 15, 1991. (Tr. Ex. 5).

40. Prior to the guardianship hearing, Mary Baker took Mr. Baker to Paul F. Hintze, M.D., an internist, to be evaluated. (Tr. at 28, ll. 12-25). Dr. Hintze signed a written Deposition of Medical Professional which stated a diagnosis of "Dementia, Alzheimer's type," and listed the following symptoms or actions of Mr. Baker that Dr. Hintze observed that caused him to make this diagnosis:

> Inability to state correct date, or month
> Inability to drive a car without getting lost (by history)
> Cannot subtract 7 from 100
> Cannot recall 3 objects for 5 minutes
> Cannot find his way in and out of unfamiliar building without help

(Tr. Ex. 6 at 5, ¶¶ 9-10). Dr. Hintze opined that Mr. Baker was partially incapacitated and partially disabled, (id., ¶ 11), but was not an incapacitated person. (Id., ¶ 11). The Deposition defined the term "partially incapacitated person" as: "One who is unable by reason of any physical or mental condition to receive or evaluate information or to communicate decisions to the extent that he lacks capacity to meet, in part, essential requirements for food, clothing, shelter, safety or other care without court ordered assistance." (Id. at 1-2, ¶ c).

41. Later in the Deposition, Dr. Hintze opined that Mr. Baker was disabled, rather than partially disabled. (Tr. Ex. 6 at 6, ¶ 17). The Deposition defined the term "disabled person" as: "One who is unable by reason of any physical or mental condition to receive and evaluate information or to communicate decision to such an extent that the person lacks ability to manage his financial resources." (Id. at 1, ¶ a.) Dr. Hintze opined that Mr. Baker was "unable to manage money – cannot add or subtract." (Id. at 7, ¶ 19).

42. Mary Baker testified that Mr. Baker testified at his guardianship hearing that he wanted Mary to be appointed as his guardian, and she was appointed as guardian on August 1, 1991. (Tr. at 43, ll. 23-25 to 44, ll. 1-8). Mary also testified that it was Mr. Baker's idea to change the beneficiary designation on his life insurance policy, because he "was mad at" Deborah Baker and Troy Baker, Jr., and "didn't want them to have anything." (Tr. at 40, ll. 1-9). Mary testified that she did not suggest that he change the beneficiary to her, and that, "You didn't tell [Mr Baker] much what to do." (Id., ll. 1-6). Mary testified that Mr. Baker testified at the guardianship hearing that he "did not want either of his children to profit from his death." (Id., ll. 9-13).

43. The county Public Administrator was appointed as the conservator of Mr. Baker's estate because Deborah Baker and Troy Baker, Jr. opposed Mary's appointment as conservator. (Tr. at 44, ll. 9-17; at 52, ll. 8-13).

44. Mr. Baker lived with Mary Baker in her home from 1991 until 1997, when he went into a nursing home. (Tr. at 44, ll. 18-22). They never remarried. (Joint Statement of Facts, ¶ 10).

45. Mary Baker continued to serve as Mr. Baker's guardian until the time of his death in 2009. (Joint Statement of Facts, ¶ 11).

46. Mr. Baker passed away on December 26, 2009. (Tr. Ex. E).

47. The Court finds that Cheryl Schwartz was the most credible of the witnesses, and that Mary Baker's testimony was more credible than that of Deborah Baker and Troy L. Baker, Jr. In particular, the Court credits Cheryl Schwartz and Mary Baker's testimony about Mr. Baker's mental condition in early March 1991, his desire to leave North Carolina and return to Missouri, and his wish to change the Policy beneficiary to Mary Baker because he was angry at his children and was grateful to Mary for agreeing to bring him back to Missouri and to take care of him as his condition worsened.

11

48. The Court finds that although Mr. Baker had been diagnosed with Alzheimer's disease in 1990 and had some dementia, he was mentally competent to change the beneficiary of his life insurance policy on March 7, 1991. The testimony of Cheryl Schwartz and Mary Baker was that Mr. Baker's mental state was largely unchanged from January 1990 through March 1991, and that in March 1991 he was able to dress and care for himself, he knew who his family members were, the names and ages of his children and grandchildren, and was not confused about what sort of assets he owned. This finding of mental competence is also supported by the testimony of Deborah Baker that Mr. Baker had the mental capacity to live alone in North Carolina from late 1990 until March 5, 1991, that she was certain he understood what he was doing when he designated Deborah as sole beneficiary of the Policy on July 22, 1990, and that he "pretty much" understood from January 1991 through March 5, 1991, when she talked with him about his financial matters.

49. The Court further finds that while Mr. Baker had some dementia on March 7, 1991 as a result of Alzheimer's disease, all the evidence shows that he had the mental capacity to choose to change the beneficiary of the Policy, and made a knowing and conscious decision of his own free will to change the Policy beneficiary to Mary Baker.

50. There is no credible evidence of undue influence by Mary Baker to override and destroy Mr. Baker's free will, such that the action of changing the Policy beneficiary was his own, and not Mary's. The fact that close in time to Mr. Baker's execution of the change of beneficiary form on March 7, 1991 he consulted a UAW attorney in North Carolina prior to giving Mary Baker a durable power of attorney, and consulted another UAW attorney when he returned to Missouri and sought to have Mary Baker appointed as his guardian, is further evidence that he was not unduly influenced by Mary Baker, and voluntarily took the action of changing the Policy's beneficiary.

**CONCLUSIONS OF LAW**

This Court has jurisdiction over this matter pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, because this action arises under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001, et seq., a law of the United States. Further, this is an interpleader action pursuant to Rule 22 of the Federal Rules of Civil Procedure. This Court also has jurisdiction pursuant to 28 U.S.C. § 1335 because two or more adverse claimants of diverse citizenship are claiming entitlement to life insurance benefits interpleaded into the Court registry, the value of which exceeds $500.

Venue is proper pursuant to 29 U.S.C. § 1132(e)(2), 28 U.S.C. § 1397, and 28 U.S.C. § 1391(b), because a defendant resides in this district and a substantial part of the events giving rise to this action occurred in this district. The parties agree that Missouri law applies to the crossclaim at issue.

Under Missouri law, the test used for determining whether Mr. Baker as grantor had sufficient mental capacity at the time he executed the beneficiary designation on March 7, 1991 is the same test used for determining if a testator had the capacity to execute a will. See Rapp v. Rapp, 238 S.W.2d 80, 91 (Mo. Ct. App. 1951). "A [testator] is shown to have testamentary capacity when the evidence reveals that, at the time of the execution of the will or codicil, the [testator] understood the ordinary affairs of life, the value and extent of [his] property, the persons who are the natural objects of [his] bounty, and that [he] is giving [his] property to the persons mentioned in the will or codicil in the manner stated." Dorsey v. Dorsey, 156 S.W.3d 442, 446 (Mo. Ct. App. 2005) (cited cases omitted). If a testator's testamentary capacity is established, then he "has the right to dispose of [his] property according to [his] own way of thinking, and it is not for courts or juries to make a

13

will or codicil for [him]." Id. (brackets, quotation marks and internal citations omitted). The Missouri Supreme Court has stated,

> [M]ere proof of illnesses, or imperfect memory, or forgetfulness of names and persons, or old age with its attendant physical and intellectual weaknesses, or mental confusion, or arteriosclerosis, either [singly] or in combination, unless it further appears that grantor did not understand the nature of the instant transactions, and did not with such understanding voluntarily enter into and consummate the transactions, are insufficient to invalidate [legal documents].

Vineyard v. Vineyard, 409 S.W.2d 712, 717 (Mo. 1966) (quoted case omitted).

"When a [beneficiary designation] is challenged on the grounds the person executing the instrument lacked testamentary capacity, the proponents of the challenged instrument have the burden to establish a prima facie case of due execution of the [beneficiary designation] and of the sound mind of the [grantor] at the time of the instrument's execution." Dorsey, 156 S.W.3d at 446. Mary Baker therefore has the initial burden of proof.

Based on the facts discussed above, the Court concludes that Mary Baker met her initial burden to establish due execution by Mr. Baker of the Policy beneficiary designation on March 7, 1991, and that Mr. Baker had the mental capacity to execute the beneficiary designation on that date. Mr. Baker was forgetful and had an imperfect memory, but he knew the nature and extent of his property, the names of his relations, and the disposition that he wished to make of his property.

To overcome this showing and establish Mr. Baker's lack of mental capacity or undue influence by Mary Baker, the burden of proof is on crossclaim plaintiffs Deborah Baker and Troy L. Baker Jr. to show evidence of mental incapacity or undue influence that is "clear, cogent and convincing." See Ulrich v. Zimmerman, 349 Mo. 772, 781 (Mo. 1942). Missouri courts have defined undue influence as "force, coercion, [or] overpersuasion . . . which destroys the will power or free agency of a grantor to act. To be effectual to invalidate this change of beneficiary *undue*

14

*influence* must have been in active exercise at the time of the change, and with such potency that the change was not the action of [Mr. Baker], but was the act of [Mary]." Rapp, 238 S.W.2d at 91 (internal citation omitted). In other words, Deborah and Troy, Jr. must establish that Mr. Baker was "unable to act freely in the designation of a beneficiary." Metropolitan Life Ins. Co. v. Parker, 721 F. Supp. 227, 229 (E.D. Mo. 1989). Evidence of undue influence may be inferred from facts and circumstances in the case, but the facts and circumstances must be convincing and mere suspicion of or opportunity for undue influence are insufficient. Rapp, 238 S.W.2d at 91.

Proof of the existence of certain factors may raise a rebuttable presumption of undue influence. A presumption of undue influence arises if the contesting parties shows that: 1) a confidential or fiduciary relationship exists between the decedent and the beneficiary; 2) the beneficiary has been given a substantial benefit by the beneficiary designation; and 3) the beneficiary was active in procuring the execution of the beneficiary designation. Simmons v. Inman, 471 S.W.2d 203, 206 (Mo. 1971). When supported by probative evidence, the presumption makes a prima facie case which does not disappear upon the introduction of rebutting evidence and raises an issue for the fact finder. Id.

Assuming without deciding that such a presumption arose in this case, the Court finds that Deborah Baker and Troy L. Baker, Jr. have not shown by clear, cogent and convincing evidence that Mary Baker unduly influenced Mr. Baker to change the beneficiary designation, or that he lacked the mental capacity to make the designation change on March 7, 1991. The substantial weight of the evidence presented was that Mr. Baker had the mental capacity to change the beneficiary designation, and that he did so because he was angry with his children and was grateful to Mary Baker that she was willing to return him to Missouri as he desired, and that she agreed to care for

him as his condition worsened; which she did, allowing Mr. Baker to live in her home for six years and then continuing to act as his guardian until he passed away another twelve years later.

## **CONCLUSION**

Based on evidence presented at trial, this Court finds and concludes that Troy Baker, Sr. possessed testamentary capacity on March 7, 1991 when he executed a beneficiary designation in favor of Mary Baker and, further, that Mary Baker did not exercise undue influence over Mr. Baker causing him to make the designation. The March 7, 1991 beneficiary designation was therefore valid and lawful and will be upheld. For these reasons, the Court will dismiss the Crossclaim, enter judgment in favor of cross-defendant Mary Baker and against cross-plaintiffs Deborah A. Baker and Troy L. Baker, Jr., and order the Clerk of the Court to disburse the interpleaded funds in the Court registry to Mary Baker.

An appropriate order and judgment will accompany this Memorandum and Order.

*/s/ Charles A. Shaw*
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this  1st  day of August, 2013.